JEREMY LEWIN (Ill. Bar. No. 6269242)
RONALD S. CONNELLY (DC Bar No. 488298)
Applying pro hac vice
POWERS PYLES SUTTER & VERVILLE, PC
1501 M Street, N.W., 7th Floor
Washington, DC 20005
Telephone: (202) 466-6550
Facsimile: (202) 785-1756
Email: Jeremy.Lewin@PowersLaw.com
Email: Ron.Connelly@PowersLaw.com

DICK A. SEMERDJIAN (SBN123630)
SCHWARTZ SEMERDJIAN CAULEY & EVANS LLP
101 West Broadway, Suite 810
San Diego, CA 92101-8229
Telephone: (619) 236-8821
Facsimile: (619) 236-8827
Email: das@sscelaw.com

Attorneys for Amicus Curiae

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN ACADEMY OF EMERGENCY MEDICINE PHYSICIAN GROUP, INC.<br><br>*Plaintiff*,<br><br>v.<br><br>ENVISION HEALTHCARE CORPORATION<br><br>*Defendant*. | Case No. 3:22-cv-00421-CRB<br><br>**BRIEF OF AMICUS CURIAE AMERICAN COLLEGE OF EMERGENCY PHYSICIANS IN SUPPORT OF PLAINTIFF** |

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE ...................................................................1

INTRODUCTION ...........................................................................................2

BACKGROUND .............................................................................................3

DISCUSSION .................................................................................................6

CONCLUSION .............................................................................................10

# TABLE OF AUTHORITIES

**Statutes**

Cal. Bus. & Prof. Code § 2052 (West 2022) .............................................................. 6

Cal. Bus. & Prof. Code § 2400 (West 2022) .............................................................. 5

**Other Authorities**

ACEP, *Code of Ethics for Emergency Physicians* (Jan. 2017)
https://www.acep.org/globalassets/new-pdfs/policy-statements/code-of-ethics-for-emergency-physicians.pdf ................................................................................ 7, 8

ACEP, *Emergency Physician Contractual Relationships* (Apr. 2021)
https://www.acep.org/globalassets/new-pdfs/policy-statements/emergency-physician-contractual-relationships.pdf ........................................................................ 7

ACEP, *Emergency Physician Rights and Responsibilities* (Apr. 2021)
https://www.acep.org/globalassets/new-pdfs/policy-statements/emergency-physician-rights-and-responsibilities.pdf ......................................................................... 9

*AMA Principles of Medical Ethics*, Am. Med. Ass'n (June 2001), https://www.ama-assn.org/about/publications-newsletters/ama-principles-medical-ethics ................................. 3

Ari J. Markenson et al., *The Corporate Practice of Medicine and Fee-Splitting Prohibitions*, 33 Health Law. (Feb. 2021) https://www.americanbar.org/content/dam/aba/administrative/aba-publishing/related-files/5630153/5630153-sample.pdf ........................................ 3, 4

Arthur J. Fried et al., *Corporate Practice of Medicine: A Fifty State Survey*, EBG (Jan. 3, 2020), https://www.ebglaw.com/insights/corporate-practice-of-medicine-a-fifty-state-survey/ ........... 4

*Bylaws*, Am. Coll. Emergency Physicians (Oct. 2021),
https://www.acep.org/globalassets/sites/acep/media/about-acep/pdfs/bylaws-oct-2021.pdf) .... 1

*Federal Advocacy Overview*, Am. Coll. Emergency Physicians, https://www.acep.org/federal-advocacy/federal-advocacy-overview/ (last visited Mar. 22, 2022) ........................................ 1

*Final Committee Objectives 2021-22: Ethics Committee*, Am. Coll. Emergency Physicians, ..... 2

*How Does Health Spending in the U.S. Compare to Other Countries?*, Kaiser Fam. Found. (Jan. 21, 2022), https://www.kff.org/slideshow/health-spending-in-the-u-s-as-compared-to-other-countries-slideshow/ ................................................................................................ 5

*Issue Brief: Corporate Practice of Medicine*, Advoc. Res. Ctr., Am. Med. Ass'n (2015), https://www.ama-assn.org/media/7661/download .................................................... 3

Jordan M. Warchol, *Corporate Practice of [Emergency] Medicine*, in Emergency Medicine Advocacy Handbook (5th ed. 2019) https://www.emra.org/books/advocacy-handbook/corporate-practice ................................................................................ 3, 10

Pamela Martin et al., Cal. Rsch. Bureau, The Corporate Practice of Medicine in a Changing Healthcare Environment 1 (Apr. 2016) https://sbp.senate.ca.gov/sites/sbp.senate.ca.gov/files/CRB%202016%20CPM%20Report.pdf 5

*Physicians and Surgeons: Information Pertaining to the Practice of Medicine*, Med. Bd. Cal., https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/ ....... 5, 7, 8

*The Most Expensive Health Care System in the World*, Harv. Sch. Pub. Health, https://www.hsph.harvard.edu/news/hsph-in-the-news/the-most-expensive-health-care-system-in-the-world/ ................................................................................................ 4

**INTEREST OF *AMICUS CURIAE***

The American College of Emergency Physicians ("ACEP" or the "College") is the nation's largest nonprofit professional association focused on furthering the professional development of emergency physicians and providing them with resources to help them deliver the highest levels of care to the patients they serve.[1] Founded in 1968 by a small group of physicians who shared a commitment to improving the quality of emergency care, ACEP set out to educate and train physicians in emergency medicine to provide quality emergency care in the nation's hospitals.

In 1979, emergency medicine was recognized as the 23rd medical specialty, a major milestone for ACEP and its members. The American Board of Emergency Medicine, the independent certifying body for the specialty, was also established, and the first certification exam was given in 1980. ACEP passed another historic milestone when criteria-based membership requirements were implemented. Starting January 1, 2000, board certification or residency training in emergency medicine became a prerequisite for active or full-voting membership. Today, ACEP represents more than 38,000 emergency physicians, emergency medicine residents and medical students. ACEP promotes the highest quality of emergency care and is the leading advocate for emergency physicians, their patients, and the public. The College continually strives to improve the quality of emergency medical services through:

- The development of evidence-based clinical guidelines and policy statements;
- Advancing emergency medicine research;
- Providing public education on emergency care and disaster preparedness;
- Legislative and regulatory advocacy efforts;[2]

---

[1] The twelve primary purposes of ACEP can be found in Article II, Section 2 of its bylaws. *Bylaws*, Am. Coll. Emergency Physicians (Oct. 2021), https://www.acep.org/globalassets/sites/acep/media/about-acep/pdfs/bylaws-oct-2021.pdf).

[2] "ACEP is an active force in Washington, D.C., working on important issues that affect emergency medical care. ACEP's federal advocacy efforts revolve around one thing: ensuring that life-saving emergency care is there when it's needed nationwide." *Federal Advocacy Overview*, Am. Coll. Emergency Physicians, https://www.acep.org/federal-advocacy/federal-advocacy-overview/ (last visited Mar. 22, 2022).

- Providing industry-leading continuing medical education in the form of educational conferences, online training, professional references, and news magazines;

- Publishing *Annals of Emergency Medicine*, the specialty's leading peer-reviewed scientific journal.

ACEP's physician members practice in a variety of settings, from small independent groups to large national practices, in academic settings and in the military. As the voice of the specialty, ACEP's strength lies in its commitment to supporting all emergency physicians and the patients they serve.

In every practice size and setting, ACEP believes that the physician-patient relationship is the moral center of medicine, a belief that is reflected throughout ACEP's official policies and guidelines. Over the course of its 54-year history, ACEP has promulgated numerous policies and guidelines that stress the importance of physician autonomy and physician-led medical decision-making and stand against any motives that place profits over patients or jeopardize the quality of care. As physician practice models have evolved, ACEP's Board has continued to develop policies for emerging challenges to physician autonomy and related ethics issues. The ACEP Ethics Committee and Medical-Legal Committee are tasked with developing information papers on the corporate practice of medicine, fee-splitting and related issues.[3] ACEP firmly believes that medical decisions must be made by physicians and opposes any practice structure that threatens physician autonomy, the patient-physician relationship, or the ability of the physician to place the needs of patients over profits.

---

[3] One of the assigned tasks of the ACEP Ethics Committee is to "[s]erve as a resource to the Medical-Legal Committee to develop an information paper regarding the corporate practice of medicine, fee splitting, anti-trust issues related to GME, and exhibitors or sponsors at ACEP meetings" and one of the assigned tasks of the Medical-Legal Committee is to "[d]evelop an information paper regarding the corporate practice of medicine, fee splitting, anti-trust issues related to GME, and exhibitors or sponsors at ACEP meetings" and to "obtain input from the [Ethics Committee]." *Final Committee Objectives 2021-22: Ethics Committee*, Am. Coll. Emergency Physicians, https://www.acep.org/globalassets/new-pdfs/committees/committee-objectives/ethics.pdf (last visited Mar. 17, 2022).

## INTRODUCTION

Although Plaintiff raises several issues in its complaint, we focus here on the corporate practice of medicine doctrine. The principle of putting patients over profits is the bedrock of our nation's healthcare system.[4] This principle is preserved by ensuring clinical treatment decisions are made exclusively by physicians. ACEP recognizes the potential efficiencies associated with larger practice sizes and counts among its members many physicians practicing in large groups, including some backed by private equity investment.[5] However, ACEP also recognizes that unregulated corporate involvement in medicine may threaten physician autonomy and adversely impact quality of care. ACEP strongly believes that, regardless of structure, physicians must focus primarily on patient care and never prioritize profits over patients.

## BACKGROUND

Laws prohibiting the corporate practice of medicine ("CPOM") have existed for more than a century. Ari J. Markenson et al., *The Corporate Practice of Medicine and Fee-Splitting Prohibitions*, 33 Health Law. 2 (Feb. 2021).[6] "The central tenet of CPOM is to protect physician autonomy. . . . This is especially important when the fiduciary obligation of a corporation to its shareholders does not align with the physician's obligation to patients." Jordan M. Warchol, *Corporate Practice of [Emergency] Medicine*, *in* Emergency Medicine Advocacy Handbook (5th ed. 2019).[7] The CPOM doctrine is based on a number of public policy concerns, such as:

> (1) allowing corporations to practice medicine or employ physicians will result in the commercialization of the practice of medicine; (2) a corporation's obligation to its shareholders may not align with a physician's obligation to their patients; and

---

[4] *See AMA Principles of Medical Ethics*, Am. Med. Ass'n (June 2001), https://www.ama-assn.org/about/publications-newsletters/ama-principles-medical-ethics ("The medical profession has long subscribed to a body of ethical statements developed primarily for the benefit of the patient. As a member of this profession, a physician must recognize responsibility to patients first and foremost.").

[5] In 2019, the ACEP Board adopted Resolution 58(19) entitled Role of Private Equity in Emergency Medicine. Part of the resolution directed the College to study the market penetration of non-physician owned emergency medicine groups and their impacts on physicians.

[6] https://www.americanbar.org/content/dam/aba/administrative/aba-publishing/related-files/5630153/5630153-sample.pdf.

[7] https://www.emra.org/books/advocacy-handbook/corporate-practice.

(3) employment of a physician by a corporation may interfere with the physician's independent medical judgment.[8]

While state CPOM laws may share clear and common goals, application of these laws is burdened by a complicated web of statutes, court cases, medical licensure board opinions, attorney general opinions, and other pronouncements that vary from state to state and continue to evolve over time.[9]  Adding to the complexity, CPOM laws typically have several exceptions, such as professional corporations and employment of physicians by certain health care entities. Thus, to determine whether a particular business arrangement violates the tenets of the prohibition, courts must rely on a complex blend of statutes, regulations, and interpretations, as well as other forms of public policy pronouncements:

> States that continue to prohibit the corporate practice of medicine rarely do so through a single law or regulation, although some states deliberately outline the statutory basis for having and enforcing the prohibition ban. In some states, the doctrine can be found in the hospital licensing statutes and professional corporation statutes that give specific authority for corporations to practice medicine. In the many states that lack any corporate practice statutes on their books, restrictions may still exist through case law, attorneys' general opinions, and opinions of medical licensure boards. To determine whether a business arrangement violates the tenets of the prohibition, most courts and attorneys general rely on a blend of law, regulation, and interpretation, including licensing statutes, professional practice acts, and public policy.

Ari J. Markenson et al., *The Corporate Practice of Medicine and Fee-Splitting Prohibitions*, 33 Health Law. 10 (Feb. 2021).[10]

Moreover, as our healthcare system has become increasingly complex, new healthcare delivery structures are emerging, including larger medical practice groups backed by private

---

[8] *Issue Brief: Corporate Practice of Medicine*, Advoc. Res. Ctr., Am. Med. Ass'n (2015), https://www.ama-assn.org/media/7661/download.

[9] *See* Arthur J. Fried et al., *Corporate Practice of Medicine: A Fifty State Survey*, EBG (Jan. 3, 2020), https://www.ebglaw.com/insights/corporate-practice-of-medicine-a-fifty-state-survey/ ("Corporate Practice of Medicine (CPOM) application is far from simple, and adoption and enforcement vary by state. States adopt various models—with exceptions—and others eliminate the prohibition completely, while some states have CPOM prohibitions that are not enforced" and further noting "CPOM researchers typically need to review a tangled web of statutes, regulations, case law, and attorney general or agency opinions to gain useful insight.").

[10] https://www.americanbar.org/content/dam/aba/administrative/aba-publishing/related-files/5630153/5630153-sample.pdf.

equity investment.  Proponents of these arrangements point to cost efficiencies[11] that can result in savings to patients, governmental healthcare insurance programs, and hospitals; more sophisticated business management structures that relieve physicians of administrative burdens and allow them to focus on treating patients; standardized policies, training programs and quality initiatives; and a host of other efficiencies associated with large practice size.  However, others raise concerns about shareholder priorities causing a shift in focus from patients to profits; equity and autonomy issues for physicians; and the potential for corporate interference in medical decision making.

California has banned CPOM since the 1920s.  Pamela Martin et al., Cal. Rsch. Bureau, The Corporate Practice of Medicine in a Changing Healthcare Environment 1 (Apr. 2016) ("From the late 1920s, California courts have staunchly protected the right of physicians to practice without being subject to potential interference by corporate employers.").[12]  California bans CPOM "in order to prevent the conflict between the professional standards and obligations of medical professionals and the profit motive of the corporate employer."  *Id.* at 2 (internal quotations omitted).

Despite the complexities of today's medical practice structures, California's CPOM statute is surprisingly brief and general in nature, causing conflicting interpretations among stakeholders with competing priorities.  California Business & Professions Code section 2400 states: "Corporations and other artificial legal entities shall have no professional rights, privileges, or powers."[13]  Regarding the foregoing general clause, the Medical Board of California ("MBC") has stated: "This section of the law is intended to prevent unlicensed

---

[11] "The U.S. spends more on health care than all the other wealthy democracies in the world."  *The Most Expensive Health Care System in the World*, Harv. Sch. Pub. Health, https://www.hsph.harvard.edu/news/hsph-in-the-news/the-most-expensive-health-care-system-in-the-world/.  "The data through 2020 shows that the U.S. spends significantly more on health care than other nations, both on a per-capita basis and relative to its wealth."  *How Does Health Spending in the U.S. Compare to Other Countries?*, Kaiser Fam. Found. (Jan. 21, 2022), https://www.kff.org/slideshow/health-spending-in-the-u-s-as-compared-to-other-countries-slideshow/.

[12] https://sbp.senate.ca.gov/sites/sbp.senate.ca.gov/files/CRB%202016%20CPM%20Report.pdf.

[13] Cal. Bus. & Prof. Code § 2400 (West 2022).

persons from interfering with, or influencing, the physician's professional judgment."[14]  And California Business and Professions Code section 2052 states that "any person who practices or attempts to practice, or who advertises or holds himself or herself out as practicing . . . [medicine] without having at the time of so doing a valid, unrevoked, or unsuspended certificate . . . is guilty of a public offense . . . ."[15]

### DISCUSSION

Although ACEP's physician members practice in a variety of settings, we are united in our commitment to promoting equity and autonomy for emergency physicians and providing the highest levels of care for the patients we serve.  These shared commitments allow ACEP to speak with a singular voice to patients, lawmakers, and the public, presenting a critical conduit through which emergency physicians can advocate for the issues most important to the profession and our patients.  CPOM certainly is among these issues, and ACEP applauds Plaintiff's efforts to address any potential violations through appropriate legal channels.  It is imperative to correct any issue with the potential to diminish quality of care.

ACEP also encourages all stakeholders to ensure their efforts to reconcile this complicated issue do not fractionalize the singular voice of emergency physicians.  This singular voice has been instrumental in each of the initiatives championed by ACEP for five decades to benefit not only ACEP's members, but the profession as a whole and the public.  These initiatives include advocacy for physician fairness and equity, public awareness campaigns, standardized care guidelines, continuing education tools, and supporting scientific research. ACEP is the trusted source of information on issues related to emergency care, and this critical role will be marginalized if we allow our increasingly complex healthcare delivery system to divide our specialty.

Our common interests here are clear: we must collectively work to prevent any practice that threatens physician autonomy and ensure that only physicians make medical decisions.

---

[14] *See Physicians and Surgeons: Information Pertaining to the Practice of Medicine*, Med. Bd. Cal., https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/.
[15] Cal. Bus. & Prof. Code § 2052 (West 2022).

These foundational principles must be applied regardless of practice size, practice type, or business structure. Every practice must demonstrate its commitment to preserving physician autonomy and physician-led medical decision making that prioritizes the patient. If a particular practice model cannot coexist with these principles, it must be changed.

ACEP strongly supports CPOM guidance issued by the MBC. The MBC has attempted to add clarity by providing examples of potential CPOM violations.

> From the Medical Board of California's perspective, the following health care decisions should be made by a physician licensed in the State of California and would constitute the unlicensed practice of medicine if performed by an unlicensed person:
>
> - Determining what diagnostic tests are appropriate for a particular condition;
> - Determining the need for referrals to, or consultation with, another physician/specialist;
> - Responsibility for the ultimate overall care of the patient, including treatment options available to the patient; and
> - Determining how many patients a physician must see in a given period of time or how many hours a physician must work.[16]

These principles are wholly consistent with ACEP's policy that "[e]mergency physicians shall embrace patient welfare as their primary professional responsibility." ACEP, *Code of Ethics for Emergency Physicians* 3 (Jan. 2017) [hereinafter *Code of Ethics for Emergency Physicians*].[17] Emergency physicians must promote patient autonomy by fully informing patients: "To choose and act autonomously, patients must receive accurate information about their medical conditions and treatment options. Emergency physicians must therefore relay sufficient information to patients to enable them to make an informed choice among various diagnostic and treatment options." *Id.* at 7. Elsewhere, ACEP has emphasized that "[t]he emergency physician is individually responsible for the ethical provision of medical care within the physician-patient relationship, regardless of financial or contractual relationships." ACEP, *Emergency Physician Contractual Relationships* 2 (Apr. 2021).[18] Accordingly, "[g]atekeeping

---

[16] *Physicians and Surgeons: Information Pertaining to the Practice of* Medicine, *supra* note 14.
[17] https://www.acep.org/globalassets/new-pdfs/policy-statements/code-of-ethics-for-emergency-physicians.pdf.
[18] https://www.acep.org/globalassets/new-pdfs/policy-statements/emergency-physician-contractual-relationships.pdf.

activities that threaten patient safety are unethical, as are clauses that prevent physicians from informing patients about reasonable treatment alternatives." *Code of Ethics for Emergency Physicians*, at 9.

The MBC has also identified a number of specific business activities that should be left to physicians:

> In addition, the following "business" or "management" decisions and activities, resulting in control over the physician's practice of medicine, should be made by a licensed California physician and not by an unlicensed person or entity:
>
> - Ownership is an indicator of control of a patient's medical records, including determining the contents thereof, and should be retained by a California-licensed physician;
> - Selection, hiring/firing (as it relates to clinical competency or proficiency) of physicians, allied health staff and medical assistants;
> - Setting the parameters under which the physician will enter into contractual relationships with third-party payers;
> - Decisions regarding coding and billing procedures for patient care services; and
> - Approving of the selection of medical equipment and medical supplies for the medical practice. [19]

ACEP agrees and has codified its position. For example, ACEP's *Code of Ethics for Emergency Physicians* emphasizes the primacy of the physician's role in business administration:

> Emergency physicians should be advocates for emergency medical care as a fundamental right. Cost-effective and efficient care is important so that resources are available to provide care when it is needed. Cooperation with persons whose expertise is in the management and administration of health care systems is essential for provision of efficient care. A central role of physicians is to keep patient interests paramount in administrative and business decisions.

*Code of Ethics for Emergency Physicians*, at 9. The MBC has similarly stated, "[w]hile a physician may consult with unlicensed persons in making the 'business' or 'management' decisions . . . the physician must retain the ultimate responsibility for, or approval of, those decisions."[20]

---

[19] *Physicians and Surgeons: Information Pertaining to the Practice of Medicine*, Med. Bd. Cal., https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/.
[20] *Physicians and Surgeons: Information Pertaining to the Practice of Medicine*, *supra* note 14.

The MBC also states that certain medical ownership and operating structures constitute prohibited CPOM:

- Non-physicians owning or operating a business that offers patient evaluation, diagnosis, care and/or treatment;
- Physician(s) operating a medical practice as a limited liability company, a limited liability partnership, or a general corporation;
- Management service organizations arranging for, advertising, or providing medical services rather than only providing administrative staff and services for a physician's medical practice (non-physician exercising controls over a physician's medical practice, even where physicians own and operate the business); and
- A physician acting as "medical director" when the physician does not own the practice.

These statements are consistent with ACEP's guidance that "[e]mergency physician autonomy should not be unduly restricted by value based or other cost-saving guidelines, contracts, rules, or protocols.  The physicians must have the ability to do what they believe in good faith is in the patient's best interest."  ACEP, *Emergency Physician Rights and Responsibilities* 1 (Apr. 2021).[21]

The MBC's examples provide useful guidance and can be instructive in determining whether a particular practice setting may violate California's CPOM regulations.  Notably, neither the MBC's guidance, nor the regulations themselves, prohibit large group size or private equity investment.  Prohibitions on size of practice and source of investment are similarly absent from CPOM laws in other states.  Similarly, large group size and private equity investment are not required to find a violation of CPOM laws.  To the contrary, courts have found CPOM violations even in single physician practices.  *See, e.g.*, *Carothers v. Progressive Ins., Inc.*, 33 N.Y.3d 389 (2019) (a single physician who associated himself with a single non-physician investor was found to have violated the corporate practice of medicine prohibition).

Nevertheless, where non-physician stakeholders are introduced, special attention should be given to ensure that shareholder interests do not interfere with physician autonomy.  For

---

[21] https://www.acep.org/globalassets/new-pdfs/policy-statements/emergency-physician-rights-and-responsibilities.pdf.

example, a study of emergency physician autonomy in various practice settings suggested that independent practices may offer more physician autonomy in medical decision-making:

> Many emergency physicians (47.3%) are employed, with 27.9% having an ownership stake in their practice and 24.8% practicing as independent contractors. It is not clear what effect employment has on practice autonomy. A 2014 study found that 68.2% of employed physicians indicated that their ability to make the best decisions for patients had some or many limitations, compared to 70.6% of physician owners.

Jordan M. Warchol, Corporate Practice of [Emergency] Medicine, in Emergency Medicine Advocacy Handbook (5th ed. 2019) .[22]

ACEP encourages groups of all types and sizes to implement internal protocols to ensure nothing interferes with a physician's autonomy in making medical decisions. However, this may be especially important for groups with employed physicians and non-physician investment.

## CONCLUSION

The foundational principle of CPOM is that medical decisions should be made by physicians and *any structure* that prevents this should be prohibited. Should the Court decide to hear this case, the Court's decision should be guided by this foundational principle.

Respectfully submitted,

*/s/Jeremy Lewin*
Jeremy Lewin*
Jeremy.Lewin@PowersLaw.com

*/s/ Ronald S. Connelly*
Ronald S. Connelly*
Ron.Connelly@PowersLaw.com
D. Benson Tesdahl
POWERS PYLES SUTTER &
VERVILLE, PC
1501 M Street, N.W., 7th Floor
Washington, DC 20005
T: (202) 466-6550

*Counsel for Amicus*
*Applying Pro Hac Vice*

Dated: March 25, 2022

*/s/ Dick A. Semerdjian*
Dick A. Semerdjian
SCHWARTZ SEMERDJIAN CAULEY &
EVANS LLP
101 West Broadway, Suite 810
San Diego, CA 92101-8229
(619) 236-8821

*Counsel for Amicus*

---

[22] https://www.emra.org/books/advocacy-handbook/corporate-practice.