Alicia F. Wagnon (SBN #152220)
Joseph M. Cachuela (SBN #285081)
Lance M. Martin (SBN #294457)
CALIFORNIA MEDICAL ASSOCIATION
CENTER FOR LEGAL AFFAIRS
1201 K Street, Suite 800
Sacramento, California 95814-3933
Telephone: (916) 444-5532
awagnon@cmadocs.org
jcachuela@cmadocs.org
lmartin@cmadocs.org

Attorney for Amicus Curiae
CALIFORNIA MEDICAL ASSOCIATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| AMERICAN ACADEMY OF EMERGENCY MEDICINE PHYSICIAN GROUP, INC., a Wisconsin Corporation,<br><br>Plaintiff,<br><br>vs,<br><br>ENVISION HEALTHCARE CORPORATION; a Delaware Corporation; ENVISION PHYSICIAN SERVICES LLC; a Delaware Limited Liability Corporation doing business in California,<br><br>Defendants. | Case No. 22-cv-421-CRB<br><br>**[PROPOSED] AMICUS CURIAE BRIEF BY CALIFORNIA MEDICAL ASSOCIATION IN SUPPORT OF PLAINTIFF'S RESPONSE TO MOTION TO DISMISS** |

**FRAP 29 DISCLOSURE**

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), the undersigned counsel for the California Medical Association represents that no party or party's counsel (i) authored this amicus brief in whole or in part; (ii) contributed money that was intended to fund preparing or submitting this brief; or (iii) contributed money that was intended to fund preparing or submitting the brief, other than the amicus curiae, its members, or its counsel.

Dated: March 25, 2022

CALIFORNIA MEDICAL ASSOCIATION
Center for Legal Affairs

By:     */s/ Lance M. Martin*

Lance M. Martin
Attorney for Amicus Curiae
CALIFORNIA MEDICAL ASSOCIATION

**CONTENTS**

INTRODUCTION ............................................................................................................................. 1

INTERESTS OF THE AMICUS CURIAE ................................................................................... 2

DISCUSSION ................................................................................................................................. 2

    A.  CPOM Traditionally Was Designed to Thwart Interference with the Practice of Medicine by Non-Licensed Individuals and Entities ................................................................. 3

    B.  CPOM Also Prohibits Arrangements and Structures that Create Unacceptable Risks of Interference ............................................................................................................................ 6

CONCLUSION ............................................................................................................................. 10

# TABLE OF AUTHORITIES

CASES

*Benjamin Franklin Life Assurance Co. v. Mitchell*
  14 Cal. App. 2d 654 (1936) ............................................................................................ 4

*Blank v. Palo-Alto-Stanford Hospital Center*
  234 Cal. App. 2d 377 (1965) ........................................................................................... 4

*California Association of Dispensing Opticians v. Pearle Vision Center, Inc.*
  143 Cal. App. 3d 419 (1983) ........................................................................................... 4

*California Physicians' Service v. Aoki Diabetes Research Institute*
  163 Cal. App. 4th 1506 (2008) ........................................................................................ 5

*Complete Service Bureau v. San Diego Medical Society*
  43 Cal. 2d 201 (1954) ...................................................................................................... 4

*Marik v. Superior Court*
  191 Cal. App. 3d 1136 (1987) ......................................................................................... 4

*Pacific Employers Ins. Co. v. Carpenter*
  10 Cal. App. 2d 592 (1935) ............................................................................................. 3

*Painless Parker v. Board of Dental Examiners*
  216 Cal. 285 (1932) ......................................................................................................... 7

*People ex rel. State Bd. of Med. Examiners v. Pacific Health Corp.*
  12 Cal. 2d 156 (1938) ...................................................................................................... 7

*People v. Cole*
  38 Cal. 4th 964 (2006) ..................................................................................................... 7

*People v. Superior Court (Cardillo)*
  218 Cal. App. 4th 492 (2013) .......................................................................................... 4

STATUTES

Cal. Bus. and Prof. Code §2406 ............................................................................................ 8
Cal. Bus. and Prof. Code §2402 ............................................................................................ 8
Cal. Corp. Code §13401.5 ..................................................................................................... 8
Cal. Corp. Code §13406 ........................................................................................................ 8

CALIFORNIA ATTORNEY GENERAL OPINIONS

11 Ops. Cal. Att. Gen. 236, 237 (1948) ................................................................................ 7
55 Ops. Cal. Atty. Gen. 103 (1972) ....................................................................................... 8
65 Ops. Cal. Atty. Gen. 223 (1982) ....................................................................................... 8
65 Ops. Cal. Atty. Gen. 223, 225 (1982) ............................................................................... 3
83 Ops. Cal. Atty. Gen. 170 (2000) ....................................................................................... 5

The California Medical Association ("CMA") hereby submits this amicus curiae brief in support of Plaintiff American Academy of Emergency Medicine Physician Group, Inc.'s ("AAEMPG") Opposition to the Motion to Dismiss by Defendants Envision Healthcare Corporation and Envision Physician Services LLC (collectively, "Envision"). This amicus brief refers to and is based upon only public, redacted pleadings and other papers filed in this action.

**INTRODUCTION**

For numerous decades, CMA has served as the voice of California's House of Medicine to advocate for the medical profession against incursions and transgressions on the ability of physicians to provide the highest levels of medical care to their patients. A bedrock doctrine in such efforts is a century-old law prohibiting lay entities from practicing medicine. This law, generally known as the bar on the corporate practice of medicine ("CPOM"), has abided throughout many decades and has been affirmed, confirmed, and reinvigorated through scores of opinions in the state courts and regulatory agencies. CPOM is squarely raised in this action. Given the circumstances by which it is implicated and the misleading arguments that have been asserted against it in Envision's motion, CMA is compelled to submit this friend-of-the-court brief to help ensure that there is clarity surrounding CPOM.

CPOM is a broad and robust law that touches on nearly every aspect of the delivery of medical care by physicians and other licensed professionals. It springs from a fundamental public policy to protect and preserve the independence of physicians' professional judgment in the care of their patients, free from external forces that can interfere with the physician-patient relationship. There are classic cases of CPOM violations, where a lay entity employs doctors and dictates the type of care that the doctors can provide, presumably as part of a cost-saving measure. AAEMPG's First Amended Complaint ("FAC") contains allegations of such CPOM violations and on that basis alone should survive a motion to dismiss.

The allegations here also touch on a different, burgeoning area of CPOM enforcement. Because California law permits medical corporations to practice medicine only if physicians have a controlling ownership interest, there are massive efforts in the industry for lay entities, such as

1

Envision, to align with the physician owners of such medical corporations. Such "friendly" medical corporation arrangements are common, and in many cases can be desirable because they enable medical corporations to access and take advantage of needed capital and market resources. However, CMA is aware that in some instances the "friendly" alignment between a lay entity and a medical corporation can cross over into prohibited territory, wherein the lay entity gains undue influence or control over the medical corporation. The allegations in this case present a case and controversy on this very issue. It is imperative, therefore, that CPOM be properly and fairly applied in service of its public policy goal to protect physician independence from lay entity dominance. CMA herein offers its views and experience on these important topics.

## INTERESTS OF THE AMICUS CURIAE

CMA is a non-profit, incorporated professional physician association of approximately 50,000 members, most of whom practice medicine in all modes and specialties throughout California. CMA's primary purposes are "to promote the science and art of medicine, the care and well-being of patients, the protection of public health, and the betterment of the medical profession." CMA and its members share the objective of promoting high quality, safe, and cost-effective health care for the people of California.

For many decades, CMA has been the leading voice advocating for robust enforcement of CPOM. CMA regularly is involved in legislation that would bolster, undercut, eliminate, or create exceptions to CPOM. CMA also regularly files friend-of-the-court briefs in federal and state courts on issues impacting the practice of medicine, including in cases, like this one, involving interpretations and applications of CPOM. The issues raised by Envision's motion directly bear upon the interests and work of CMA on behalf of its physician members and constituents.

## DISCUSSION

AAEMPG alleges that various policies or practices by Envision have direct and indirect effects on physicians and/or the way they deliver medical care. *See* FAC ¶¶38-41, 45. AAEMPG also alleges that Envision gains influence or control over medical corporations that deliver medical care through placement of its executives in officer and director positions on those medical

2
[PROPOSED] AMICUS CURIAE BRIEF BY CMA          NO. 22-CV-421-CRB

corporations, or through stock holding and transfer restrictions on the physicians that own the corporations. *See* FAC ¶¶30-33, 36. Both sets of allegations implicate CPOM, albeit different branches of the doctrine.

### A. CPOM Traditionally Was Designed to Thwart Interference with the Practice of Medicine by Non-Licensed Individuals and Entities.

California's Medical Practice Act and Business and Professions Code sections 2052 and 2400 prohibit any person from practicing medicine without a license. Together, they establish that corporations and other artificial legal entities may not hold professional rights, privileges, or powers (i.e., hold medical licenses). These statutes form the foundation of CPOM, which broadly prohibits corporations and other lay entities from directly or indirectly practicing or controlling the practice of medicine, whether through influence, control, or direct intervention.

The California Attorney General has explained the rationale behind CPOM as a public policy of preserving the purity of physician professional judgment:

> [F]irst, that the presence of a corporate entity is incongruous in the workings of a professional regulatory licensing scheme which is based on personal qualification, responsibility and sanction, and second that the interposition of a lay commercial entity between the professional and his/her patients would give rise to divided loyalties on the part of the professional and would destroy the professional relationship into which it was cast.

65 Ops. Cal. Atty. Gen. 223, 225 (1982). CPOM thus ensures that those who make decisions which affect, generally or indirectly, the provision of medical services: 1) understand the quality of care implications of those decisions; 2) have a professional ethical obligation to place the patient's interest foremost; and 3) are subject to the full panoply of the enforcement powers of the Medical Board of California, the state agency charged with the administration of the Medical Practice Act.

CPOM today is recognized to be robust and broad, touching upon virtually all aspects of the modern practice of medicine to prohibit practices, schemes, and arrangements that directly or indirectly affect how physicians care for their patients. The case law is legion. *See, e.g.*, *Pacific Employers Ins. Co. v. Carpenter*, 10 Cal. App. 2d 592, 594-596 (1935) (holding that for-profit corporation may not engage in business of providing medical services and stating that "professions

are not open to commercial exploitation as it is said to be against public policy to permit a 'middleman' to intervene for a profit in establishing a professional relationship between members of said professions and the members of the public"); *Benjamin Franklin Life Assurance Co. v. Mitchell*, 14 Cal. App. 2d 654, 657 (1936) (same); *Complete Service Bureau v. San Diego Medical Society*, 43 Cal. 2d 201, 211 (1954) (non-profit corporations may secure low-cost medical services for their members only if they do not interfere with the medical practice of the associated physician); *Blank v. Palo-Alto-Stanford Hospital Center*, 234 Cal. App. 2d 377, 390 (1965) (non-profit hospital may employ radiologists only if the hospital does not interfere with the radiologists' practice of medicine); *California Association of Dispensing Opticians v. Pearle Vision Center, Inc.*, 143 Cal. App. 3d 419, 434 (1983) (CPOM prohibits technical agreements affecting the manner in which professionals practice because it "requires the professional's undivided responsibility and freedom from commercial exploitation").

As modern medicine advances and becomes more commercialized, CPOM has also evolved to recognize that seeming "business decisions" in a medical practice setting can result in undue influence over the practice of medicine. In *Marik v. Superior Court*, 191 Cal. App. 3d 1136 (1987), for example, the court recognized that it is difficult if not impossible to isolate "purely business" decisions from those affecting the quality of care. Notably, in holding that a provisional director of a medical corporation was required either to be a physician or other qualified licensed person, the *Marik* court recognized the interrelated nature of these concerns and observed:

> For example, the prospective purchase of a piece of radiological equipment could be implicated by business considerations (cost, gross billings to be generated, space and employee needs), medical considerations (type of equipment needed, scope of practice, skill levels required by operators of the equipment, medical ethics) or by an amalgam of factors emanating from both business and medical areas. The interfacing of these variables may also require medical training, experience, and judgment.

*Id.* at 1140 n.4. Along the same line, in *People v. Superior Court (Cardillo)*, 218 Cal. App. 4th 492 (2013), lay owners and operators of medical marijuana clinics were held to criminally violate CPOM where they controlled the operations of the clinics by employing licensed physicians to

issue recommendations for medical marijuana, setting the physicians' hours, soliciting and scheduling patients, collecting fees from the patients, and paying the physicians a percentage of those fees. *Id.* at 498.

The Medical Board of California has issued formal guidance on what constitutes violations of CPOM. *See* https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/. The board believes that certain areas in the business of medicine are rife for CPOM abuse:

- Ownership is an indicator of control of a patient's medical records, including determining the contents thereof, and should be retained by a California-licensed physician;

- Selection, hiring/firing (as it relates to clinical competency or proficiency) of physicians, allied health staff and medical assistants;

- Setting the parameters under which the physician will enter into contractual relationships with third-party payors;

- Decisions regarding coding and billing procedures for patient care services; and

- Approving of the selection of medical equipment and medical supplies for the medical practice.

*Id.* The Medical Board further explains that the types of decisions and activities described above cannot be delegated to an unlicensed person, including management service organizations. While a physician may consult with unlicensed persons in making the "business" or "management" decisions described above, the physician must retain the ultimate responsibility for, or approval of, those decisions. *Id.*

The California Attorney General has echoed the Medical Board's view. *See, e.g.*, 83 Ops. Cal. Atty. Gen. 170 (2000) ("The selection of a radiology site with appropriate equipment and operational personnel best suited for the performance of a diagnostic radiology study of a patient's particular physical disorder, as well as the selection of a qualified radiologist to view and interpret the films, would involve the exercise of professional judgment and evaluation as part of the practice of medicine."); *see also California Physicians' Service v. Aoki Diabetes Research Institute*, 163 Cal. App. 4th 1506, 1516 (2008) ("While the principal evils of the corporate practice

of medicine may arise from the stress the profit motive places on physicians, the courts have also noted the danger of lay control—a danger that attends all types of corporations").

A significant portion of the allegations in this action fall within CPOM's proscription against activities and practices affecting a physician's professional judgment. Indeed, there are allegations in the First Amended Complaint that, if proven, demonstrate classic CPOM violations:

- Plaintiff is informed and believes Envision further ensures corporate control of these professional controlled affiliate groups by requiring the physician members or owners to execute agreements limiting their authority. Such separate agreements include restrictions on the ability of the named physician owner and or members to issue dividends, create additional stock, sell the medical group, or transfer their shares (FAC ¶36);

- Envision exercises profound and pervasive direct and indirect control and/or influence over the medical practice, making decisions which bear directly and indirectly on the practice of medicine, rendering physicians as mere employees, and diminishing physician independence and freedom from commercial interests, in violation of California's corporate practice of medicine ban (FAC ¶38);

- Envision collects physicians' fees, but does not report how much they collected in the physicians' names or the group's names. Physicians are not allowed to know what is billed in their name or the Groups' name because, in part, they would know how much profit Envision is making from their professional services (FAC ¶41); and

- Envision further establishes and promulgates physician "best practices," "red rules," and "evidence-based pathways" protocols which create standards for treating patients and are used to compare the performance of physician to Envision-created or endorsed standards, a form of clinical oversight. It creates "benchmarking" reports that compare physician performance to Envision-created standards, intending to modify the exercise of their independent medical judgment. Envision tracks physician performance and then provides "practice improvement feedback" in the form of reports designed to educate physicians to practice medicine (FAC ¶45);

AAEMPG should be given the opportunity to try to prove up these allegations. Their complaint adequately states claims of CPOM violations.

**B. CPOM Also Prohibits Arrangements and Structures that Create Unacceptable Risks of Interference.**

There is another strain inherent in CPOM that has garnered more attention as the practice of medicine became more modernized and commercialized. This strain focuses not on whether there is interference with the practice of medicine but on the conditions in which physicians

practice, such as the employment relationship.

The California Supreme Court in *People v. Cole* (2006) 38 Cal. 4th 964, 970 (2006), declared that CPOM "restricts the <u>relationships</u> that [doctors] may have with corporations." (emphasis added) A decision 68 years earlier laid the foundation for this observation. In *People ex rel. State Bd. of Med. Examiners v. Pacific Health Corp.*, 12 Cal. 2d 156 (1938), a lay entity claimed that its contractual arrangements with physicians explicitly took special care to preserve the physicians' independent judgment by providing that services shall be performed at the physicians' offices and that the doctors are not employed by defendant on a salary basis, nor directed by the lay entity. *Id.* at 158. According to the lay entity, the fact that there was no actual interference or control over the practice of medicine absolved it of any CPOM transgressions. *Id.* Not so: the Court explained that CPOM cannot be "circumvented by technical distinctions in the manner in which the doctors are engaged, designated or compensated by the corporation." *Id.* CPOM can prohibit a particular structure or relationship between a physician and lay entities, even without actual interference in the practice of medicine, where "[t]he evils of divided loyalty and impaired confidence would seem to be equally present." *Id.* at 159. The Court had already reached the same conclusion in a different case to apply CPOM to prohibit the mere ownership of dentist practices by lay entities. *See Painless Parker v. Board of Dental Examiners*, 216 Cal. 285, 296 (1932).

Applying the holdings of *Pacific Health* and *Painless Parker*, the California Attorney General confirmed that CPOM prohibits not only lay entities engaging in or interfering with the practice of medicine but also hospitals and other lay entities from employing or contracting with physicians. *See* 11 Ops. Cal. Att. Gen. 236, 237 (1948). In so finding, the Attorney General observed several courts have rejected the notion that a CPOM violation depends on actual interference with the practice of medicine. *See id.* at 238-39. Rather, CPOM categorically prohibits certain relationships and business structures joining physicians and lay entities where there is "a tendency to debase the profession," or where there is potential that a lay entity would be able to directly or indirectly influence or control physicians. *Id.* at 239.

Employment relationship is a prototypical example of a prohibited relationship whereby a lay entity gains undue influence over physicians. The Attorney General has issued several other opinions reaffirming this prophylactic approach to enforcement of CPOM and found numerous types of relationships to be prohibited based on the <u>potential</u> interference with the practice of medicine created by such relationships and the presence of a potential for the physician to have divided loyalties. *See* 54 Ops. Cal. Atty. Gen. 126 (1971) (nonprofit hospital may not employ physicians to provide professional services); 55 Ops. Cal. Atty. Gen. 103 (1972) (CPOM prohibits lay entities from having an economic interest in the net profits of a medical practice); 65 Ops. Cal. Atty. Gen. 223 (1982) (general business corporation may not lawfully engage licensed physicians to treat employees even though physicians act as independent contractors and not as employees).

Although not yet addressed in any precedential decision, CMA is concerned that certain arrangements concerning the manner by which physicians hold ownership over medical corporations may run afoul of CPOM. It has become common in the industry for physicians who own medical corporations (which are permitted to employ physicians to deliver medicine) to align with lay entities. Such alignments can be informal or formal; the physician owner may also be an officer or director of the lay corporation or the physician owner may enter into a stock transfer restriction agreement with the lay entity. Physicians may enter into such alignments to access resources, funding, or other commercial advantages that they otherwise do not possess. However, depending on the details of the alignment, CMA believes a line can be crossed giving undue influence or control to the lay entity.

CMA is particularly concerned about stock transfer restriction agreements whereby a physician owner cedes authority to a lay entity over the manner by which the physician can hold or transfer ownership of the medical corporation. California Business and Professions Code sections 2402 and 2406 permit medical practice by "medical corporations" operating under the Moscone-Knox Professional Corporation Act ("Moscone-Knox"). The Corporations Code establishes numerous strict requirements for the creation and operation of such medical professional corporations. Chief among these requirements is that the medical corporation's

shareholders must be licensed professionals. *See* Cal. Corp. Code §13406. Other requirements restrict who may own a medical corporation and prohibit physician owners from entering into voting trusts or proxies. *See id.* at §§13401.5, 13406(a). It is only by strict compliance with the Moscone-Knox Act that a medical professional corporation is permitted to practice medicine (i.e., hire doctors and arrange for medical care). *See* Cal. Bus. & Prof. Code §§2402 and 2406. Accordingly, any design or arrangement limiting the ownership rights of physician owners in medical corporations could potentially enable a lay entity to do what is otherwise legally restricted to and reserved only for licensed physicians. CMA believes that true and unfettered ownership of a medical corporation is required by CPOM.

It is questionable whether CPOM is satisfied if a lay entity has contractual rights dictating when, how, and to whom a physician can transfer stock of a medical corporation. CMA also has seen, and is concerned about, stock transfer restriction agreements that give lay entities unilateral authority to force the transfer of the medical corporation's ownership.

There are allegations in this action that implicate problematic, if not unlawful, arrangements between a lay entity and a "friendly" medical corporation owner. For instance, the complaint alleges very close alignment between Envision employees/executives and the directors/officers of medical corporations. *See* FAC ¶¶30-33. There also are allegations suggesting too much control over a medical corporation's stock ownership. *See id.* ¶36 ("Plaintiff is informed and believes Envision further ensures corporate control of these professional controlled affiliate groups by requiring the physician members or owners to execute agreements limiting their authority. Such separate agreements include restrictions on the ability of the named physician owner and or members to issue dividends, create additional stock, sell the medical group, or transfer their shares").

Based on the public, unredacted pleadings and documents available, CMA cannot determine, and therefore takes no position, whether Envision has taken advantage of any artifices or arrangements with medical corporation owners in violation of CPOM. However, the allegations do appear to raise serious issues concerning alignments between Envision and medical corporation

owners that may violate CPOM.

## CONCLUSION

CMA respectfully urges the Court to deny Envision's Motion to Dismiss and permit AAEMPG's claims based on CPOM to proceed in this action.

Respectfully submitted,

Dated: March 25, 2022

CALIFORNIA MEDICAL ASSOCIATION
Center for Legal Affairs

By:     */s/ Lance M. Martin*

Lance M. Martin
Attorney for Amicus Curiae
CALIFORNIA MEDICAL ASSOCIATION

# CERTIFICATION OF WORD COUNT

The text of this brief consists of 3,284 words as counted by the Microsoft Word word-processing computer application used to generate the brief.

Dated: March 25, 2022

                                            */s/ Lance M. Martin*
                                               Lance M. Martin
                                             Attorney for Amicus Curiae
                                             CALIFORNIA MEDICAL ASSOCIATION

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of California by using the CM/ECF system on March 25, 2022. I further certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

I certify under penalty of perjury that the foregoing is true and correct. Executed this 25th day of March, 2022.

/s/ *Lance M. Martin*
Lance M. Martin