1
2
3
4
5              IN THE UNITED STATES DISTRICT COURT

6            FOR THE NORTHERN DISTRICT OF CALIFORNIA

7

8   AMERICAN ACADEMY OF              Case No. 22-cv-00421-CRB
    EMERGENCY MEDICINE
9   PHYSICIAN GROUP, INC.,
                                     **ORDER DENYING MOTION TO**
10               Plaintiff,          **DISMISS**

11          v.

12  ENVISION HEALTHCARE
    CORPORATION, et al.,
13
                 Defendants.
14

15          Plaintiff American Academy of Emergency Medicine Physician Group (AAEMPG)

16  is a corporation that provides business and administrative services to physician groups.

17  FAC (dkt. 18-1) ¶¶ 1, 21.  Having lost out on business to Defendant Envision Healthcare

18  Corp./Envision Physician Services LLC[1] (collectively, Envision), id. ¶ 69, AAEMPG now

    brings suit against Envision, id. ¶ 27.  AAEMPG alleges that Envision's business model—
19
    chiefly its relationship with the professional medical groups with which it works—violates
20
    California's ban on the corporate practice of medicine (CPOM).[2]  Id. ¶¶ 75–89.  AAEMPG
21
    seeks declaratory and injunctive relief.  Id. ¶¶ 90–108.  Envision moves to dismiss the
22
    complaint.  See Mot. (dkt. 23).  The Court heard argument on this matter on Friday, May
23
    20, 2022, see Motion Hearing (dkt. 43), and now denies the motion.
24

25

26

27  _____

    [1] AAEMPG alleges that Envision HealthCare Cop. and Envision Physician Services LLC
28  are alter-egos of each other.  FAC ¶ 3.
    [2] AAEMPG has not brought suit against the professional medical groups themselves.

## I. BACKGROUND

### A. California's Prohibition on the Corporate Practice of Medicine

This case implicates California's prohibition on CPOM. "The primary objective of the [ban] is to prevent the intrusion of commercial influence on the practice of medicine." FAC ¶ 13. The doctrine of CPOM "protect[s] physician autonomy. . . . This is especially important when the fiduciary obligation of a corporation to its shareholders does not align with the physician's obligation to patients." Amicus Br. by American College of Emergency Physicians in Support of Plaintiff (dkt. 33-1) (hereinafter ACEP Amicus) at 3 (quoting Jordan M. Warchol, Corporate Practice of [Emergency] Medicine, in Emergency Medicine Advocacy Handbook (5th ed. 2019)). The CPOM doctrine is based on a number of policy concerns, including that: (1) allowing corporations to practice medicine will commercialize the practice of medicine, (2) a corporation's obligation to its shareholders may not be the same as a physician's obligation to his or her patients, and (3) a corporation employing a physician may interfere with the physician's independent medical judgment. Id. at 3–4 (quoting Issue Brief: Corporate Practice of Medicine, Advoc. Res. Ctr., Am. Med. Ass'n (2015), available at https://www.ama-assn.org/media/7661/download).

California has banned CPOM since the 1920s. ACEP Amicus at 5. "[T]o determine whether a particular business arrangement violates [CPOM], courts must rely on a complex blend of statutes, regulations, and interpretations, as well as other forms of public policy pronouncements." Id. at 4 (citing Ari J. Markenson et al., The Corporate Practice of Medicine and Fee-Splitting Prohibitions, 33 Health Law 10 (Feb. 2021)). As a starting point, California Business and Professions Code § 2400 prohibits corporations, lay entities, or any non-licensed persons or entities from practicing medicine. See Cal. Bus. & Prof. C. § 2400 (West 2022) ("corporations and other artificial legal entities shall have no professional rights, privileges, or powers."). The Medical Board of California (MBC) has explained that "This section of the law is intended to prevent unlicensed persons from interfering with, or influencing, the physician's professional judgment." ACEP Amicus at 5–6 (quoting Physicians and Surgeons: Information Pertaining to the Practice of Medicine,

Med. Bd. Cal., https://www.mbc.ca.gov/Licensing/Physicians-and-Surgeons/Practice-Information/ (hereinafter "Physicians and Surgeons")).  California law further states that "Any person[3] who practices or attempts to practice, or who holds himself or herself out as practicing . . . [medicine] without having at the time of doing so a valid, unrevoked, or unsuspended certificate . . . is guilty of a public offense."  Cal. Bus. & Prof. C. § 2052.  And it prohibits persons from conspiring with or aiding and abetting another in the unlicensed practice of medicine.  Cal. Bus. & Prof. C. § 2052(b).  "These statutes form the foundation of CPOM, which broadly prohibits corporations and other lay entities from directly or indirectly practicing or controlling the practice of medicine, whether through influence, control, or direct intervention."  Amicus Br. by California Medical Association (dkt. 36-3) (hereinafter CMA Amicus) at 3.

A variety of other state statutes implicate CPOM.  Business and Professions Code § 650 prohibits the offer, delivery, receipt, or acceptance of consideration to induce the referral of patients.  Welfare & Institutions Code § 14107.2 similarly prohibits renumeration for referrals of patients from a physician that treats Medi-Cal beneficiaries.  Business and Professions Code § 16600 bars agreements that restrain persons from engaging in their lawful profession.  Corporations Code § 13408.5 prohibits the formation of a professional corporation in order "to cause any violation of law, or any applicable rules and regulations, relating to fee splitting, kickbacks, or other similar practices by physicians and surgeons or psychologists."  Cal. Corp. C. § 13408.5.  California law also prohibits the transfer of stock ownership in professional corporations to unlicensed persons or entities.  Cal. Corp. C. § 13407.  Business and Professions Code § 17200—the UCL— prohibits the use of unfair, unlawful, and/or fraudulent business acts or practices.  Business and Professions Code § 17500 prohibits the making of untrue or misleading statements concerning professional services.

---

[3] The statute defines "person" as "any individual, partnership, corporation, limited liability company, or other organization, or any combination thereof, except that only natural persons shall be licensed under thus chapter."  Cal. Bus. & Prof. C. § 2032.

In addition to these statutes, MBC issued guidance as to what constitutes CPOM. It explained that "the following health care decisions should be made by a physician licensed in the State of California and would constitute the unlicensed practice of medicine if performed by an unlicensed person:"

- Determining what diagnostic tests are appropriate for a particular condition;
- Determining the need for referrals to, or consultation with, another physician/specialist;
- Responsibility for the ultimate care of the patient, including treatment options available to the patient; and
- Determining how many patients a physician must see in a given period of time or how many hours a physician must work.

Physicians and Surgeons. While MBC recognized that "a physician may consult with unlicensed persons in making 'business' or 'management' decisions," "the following 'business' or 'management' decisions and activities, resulting in control over the physician's practice or medicine, should be made by a licensed California physician and not by an unlicensed person or entity:"

- Ownership is an indicator of control of a patient's medical records, including determining the contents thereof, and should be retained by a California-licensed physician;
- Selection, hiring/firing (as it relates to clinical competency or proficiency) of physicians, allied health staff and medical assistants;
- Setting the parameters under which the physician will enter into contractual relationships with third-party payers;
- Decisions regarding coding and billing procedures for patient care services; and
- Approving of the selection of medical equipment and medical supplies for the medical practice.

Id. MBC also identified the following types of businesses as prohibited:

- Non-physicians owning or operating a business that offers patient evaluation, diagnosis, care and/or treatment;
- Physician(s) operating a medical practice as a limited liability company, a limited liability partnership, or a general corporation;
- Management service organizations arranging for, advertising, or providing medical services rather than only providing administrative staff and services for a

4

physician's medical practice, even where physicians own and operate the business); and

- A physician acting as 'medical director' when the physician does not own the practice. . . .

Id.

In addition to this guidance from MBC, decisions by the California Attorney General and state court decisions further define the boundaries of CPOM. See, e.g., 83 Ops. Cal. Atty. Gen. 170 (2000) ("The selection of a radiology site with appropriate equipment and operational personnel best suited for the performance of a diagnostic radiology study of a patient's particular physical disorder, as well as the selection of a qualified radiologist to view and interpret the films, would involve the exercise of professional judgment and evaluation as part of the practice of medicine."); California Physicians' Serv. v. Aoki Diabetes Research Inst., 163 Cal. App. 4th 1506, 1516 (2008) ("While the principal evils of the corporate practice of medicine may arise from the stress the profit motive places on physicians, the courts have also noted the danger of lay control—a danger that attends all types of corporations.").

**B.      The Parties' Relationship**

The parties are competitors; both provide services to professional medical groups. Until August 2021, AAEMPG provided such services to an emergency medicine physicians group called Placentia Linda Emergency Physicians, Inc. (PLEP), which held the exclusive contract to provide emergency physician coverage at the Placentia Linda Hospital. FAC ¶ 1. AAEMPG's contract with PLEP was for the period of November 1, 2018 through November 1, 2021. Id. ¶ 21. The practice management services that AAEMPG provided to PLEP "specifically exclude all activities described in the definitions of the practice of medicine as outlined in the [M]edical [P]ractice [A]ct where Client's Hospital(s) are housed." Id. AAEMPG "lost its contract with PLEP . . . when the Hospital awarded it (and Anesthesiology coverage contracts) to Envision's affiliate medical group Premier (and EM-I)." Id. ¶ 69.

**C.      Envision's Business**

The FAC alleges the following about Envision's business.

### 1. Structure

Envision Physician Services was formed in 2017; its sole member is Envision Healthcare Corp. and it is owned and controlled by Envision Healthcare Corp. Id. ¶ 24. In 2018, Envision Healthcare Corp. was purchased for $9.9 billion; it is no longer publicly traded. Id. ¶ 25.

"Envision's business model is to circumvent the ban [on CPOM] by purchasing, controlling, or creating a separate subsidiary licensed Professional Medical Corporations." Id. ¶ 27. Those professional medical corporations are "controlled entirely by Envision" and "exist only on paper to undertake functions the law permits only physicians to undertake, such as employing physicians or providing medical coverage for hospitals." Id. Envision's predecessor companies "designed these Professional Medical Corporations to evade [CPOM] and anti-kickback rules," and they exist in all of the states where Envision operates that have CPOM prohibitions. Id. ¶ 28.

Envision chooses and appoints the medical directors of the physician entities, id. ¶ 29, including at Premier Emergency Physicians of California Medical Group, id. ¶ 30. Premier's CEO, CFO, and Director is Mark Jeffrey Slepin—a Senior Vice President of Envision Physicians' Services at its corporate headquarters in Florida. Id. ¶ 30. Slepin is an officer "for over a hundred Envision affiliates." Id. Moreover, Elene Moore, Envision Physicians' Services' General Counsel, is Premier's Secretary. Id. Premier's mailing address and executive offices are located at Envision Physicians' Services corporate headquarters in Plantation, Florida. Id.[4] Premier's corporate officers are not physicians licensed to practice medicine in California. Id. ¶ 33.

Envision has "formed hundreds of controlled affiliate practices nationwide," including others in California. Id. ¶ 35. Envision either forms the medical groups or "installs Envision executives or officers in pre-existing" medical groups, installs straw-

---

[4] The FAC also lists two additional medical corporations that are controlled by Envision: California EM-I Medical Services and Glass Beach Medical Services. See id. ¶¶ 31, 32. The corporate officers of California EM-I and Glass Beach are not physicians licensed to practice medicine in California. Id. ¶ 33

man owners or its executives as owners and officers, and binds the owners to numerous restrictions. Id. ¶ 36. The owners must sell to Envision if requested and may not remove Envision officers. Id. Envision also requires physician members to limit their authority— restricting their ability to issue dividends, create additional stock, sell the medical group, or transfer their shares. Id.

Envision insists on bylaws that "limit the rights of the shareholders in favor of Envision or its appointed Directors." Id. ¶ 28. The professional medical group's members "must execute Agreements that include restrictions on their ability to issue dividends, create additional stock, or sell the Medical Group without permission from Envision." Id. The professional medical groups "are a mere front through which Envision carries out its business and have no separate identity from Envision, except form." Id.

### 2. Control

Envision requires the professional medical groups to enter into a Management Services Agreement, giving Envision "profound and pervasive direct and indirect control and/or influence over the medical practice, making decisions which bear directly and indirectly on the practice of medicine, by rendering physicians as mere employees, and diminishing physician independence and freedom from commercial interests." Id. ¶ 38.

Specifically, Envision:

> decides how many and which physicians to hire, their compensation, and their work schedule. Envision controls and influences advertising for physician's vacancies, vetting physicians, establishing the terms of employment, the physician's rate of pay, scheduling the hours physicians will work, its staffing levels, the number of patient encounters, and working conditions. Envision decides when to terminate physicians and denies them rights to appeal via traditional medical staffing mechanisms. Envision negotiates the Groups' contracts with third-party payors and health insurers and then decides whether the group will agree to the terms. . . . Physicians are not made aware of the terms of their contracts with third-party payors.

Id. ¶ 39. Envision also "establishes and promulgates physician 'best practices,' 'red rules,' and 'evidence-based pathways' protocols," creating the standards for patient care and comparing physician performance "to Envision-created or endorsed standards, a form of

7

clinical oversight." Id. ¶ 45 (emphasis added). Envision tracks and creates "benchmarking" reports of physician performance, providing feedback to educate their physicians. Id. (emphasis added). AAEMPG asserts that "these performance standards have medical implications and violate the corporate practice doctrine." Id.

### 3. Billing

In addition, Envision "requires physicians to assign their rights to the proceeds of their medical billings to Envision who then determines what is charged to patients and insurers." Id. ¶ 40. Envision makes the coding decisions and bills patients for services; physicians "do not see what is billed and remitted in their names." Id. Envision also collects the physicians' fees, but the physicians "are not allowed to know what is billed in their name or the Groups' name." Id. ¶ 41. Envision retains amounts from the doctors' billing that exceed the reasonable value of the billing and of the administrative services Envisions provides, which AAEMPG alleges is "illegal fee-sharing with a lay entity." Id. ¶ 43. AAEMPG further alleges that because Envision "makes all hiring and firing decisions, controls the financial aspects of the group, sets salaries, controls contracting, and retains all profit," "it is the functional owner of the completely controlled affiliate groups irrespective of its use of the corporate form." Id. ¶ 45. Envision also "profit[s] by reducing physician compensation, increasing the number of patients that physicians see per hour, and increasing the utilization of physician assistants." Id. ¶ 47.

### 4. Restrictive Covenants

Envision insists that physicians "execute restrictive covenants that the physician may not attempt to assist or cause any other emergency medical practice to replace Envision." Id. ¶ 48. Contracts between Envision's controlled medical groups and the hospitals contain illegal restrictive covenants. Id. ¶ 50. AAEMPG argues that these restrictions "restrict a physician's ability to practice their profession." Id. ¶ 52. This is particularly so because many of the regions where Envision holds emergency department contracts have few emergency departments. Id.

AAEMPG asserts that Envision must know that it restrains competition because it

"requires physicians to sign a false disclaimer in their agreements that they can 'earn a reasonable living in the area in which they reside.'" Id. ¶ 54.  Envision previously acknowledged that its non-compete agreements might someday be successfully challenged. Id. ¶ 55.  AAEMPG argues that the non-compete provisions also substantially lessen competition for emergency services.  Id. ¶ 58.  AAEMPG further alleges that Envision conceals these unlawful practices by requiring all physicians to sign nondisclosure agreements concerning their employment agreements.  Id. ¶ 62.

### 5.    Kickbacks

Hospitals typically grant physician groups exclusive contracts to ensure continuous physician coverage of their emergency departments.  Id. ¶ 63.  Because such contracts guarantee a continuous flow of patients, awarding such contracts constitutes the referral of patients under California law; hospitals cannot offer consideration for the granting or renewal of such contracts.  Id. ¶ 65.  Anesthesia coverage does not provide the same level of patient flow, and so it is "nearly universal" for hospitals to provide anesthesia groups "a significant cash subsidy" for treating patients.  Id. ¶ 66.

In connection to the above, Envision provided kickbacks to acquire emergency medicine exclusive contracts.  Id. ¶ 63.[5]  "Envision pays consideration in exchange for exclusive emergency room staffing contracts by paying hospitals in reduced subsidies to its anesthesia groups."  Id. ¶ 68.  AAEMPG refers to this arrangement as a "kickback scheme."  Id. ¶ 71.  Envision also offers renumeration to physicians who control physician groups to contract with Envision [to] induce transfer of Emergency Department contracts to its completely controlled affiliate groups."  Id. ¶ 73.

### D.    Procedural History

AAEMPG first brought suit against Envision in state court, see Notice of Removal Ex. C (dkt. 1-1), but Envision removed the case to this Court based on diversity jurisdiction, see Notice of Removal (dkt. 1) at 4.  Envision then moved to dismiss, see First

---

[5] See also id. ¶¶ 67, 70 (under seal).

MTD (dkt. 11), and AAEMPG filed an amended complaint, see FAC.  The amended

complaint brings a cause of action under the UCL, alleging unlawful, unfair, and

fraudulent business practices (seeking injunctive relief), FAC ¶¶ 75–89, and a cause of

action for Declaratory and Injunctive Relief, citing Business & Professions Code § 16750,

id. ¶¶ 90–108.  AAEMPG asks (1) that Envision be enjoined from engaging in CPOM, (2)

that Envision be enjoined from offering or providing renumeration or anything of value to

hospitals in exchange for patient referrals, (3) for a declaration that causing professional

medical associations to enter into the kinds of covenants alleged violates Cal. Bus. & Prof.

Code § 16600, (4) for a declaration that the practice of agreeing to provide hospitals with

personnel without a subsidy in exchange for Emergency Department contracts violates Cal.

Bus. & Prof. Code § 650 and Welfare & Inst. Code § 14107.02, (5) for a declaration that

the control over medical professional associations by law entities is CPOM in violation of

Cal. Bus. & Prof. Code §§ 2400 and 2502, and (6) for attorneys' fees.  Id. at 29–30.

Envision again moves to dismiss.  See Mot.; see also Opp'n (dkt. 28-2); Reply (dkt. 30).

## II.    LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may dismiss

a complaint for failure to state a claim upon which relief may be granted.  Dismissal may

be based on either "the lack of a cognizable legal theory or the absence of sufficient facts

alleged under a cognizable legal theory."  Godecke v. Kinetic Concepts, Inc., 937 F.3d

1201, 1208 (9th Cir. 2019) (cleaned up).  A complaint must plead "sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face."  Ashcroft v.

Iqbal, 556 U.S. 662, 678 (200) (cleaned up).  A claim is plausible "when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  Id.  When evaluating a motion to dismiss,

the Court "must presume all factual allegations of the complaint to be true and draw all

reasonable inferences in favor of the nonmoving party."  Usher v. City of L.A., 828 F.2d

556, 561 (9th Cir. 1987).  "Courts must consider the complaint in its entirety, as well as

other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss,

1  in particular, documents incorporated into the complaint by reference, and matters of

2  which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551

3  U.S. 308, 322 (2007).

## III.  DISCUSSION

5  Envision moves to dismiss the FAC on two separate grounds: (A) the abstention or

6  primary jurisdiction doctrines, and (B) failure to state a claim.

### A.  Abstention/Primary Jurisdiction

8  Envision argues that this Court should apply either the abstention or primary

9  jurisdiction doctrines, because MBC and not the Court should decide the issues in this

10  case. See Mot. at 6. The Court disagrees.

#### 1.  Abstention

##### a.  When Appropriate

13  Under the abstention doctrine, a court "may abstain when the lawsuit involves

14  determining complex economic policy, which is best handled by the legislature or an

15  administrative agency." Alvarado v. Selma Convalescent Hosp., 153 Cal. App. 4th 1292,

16  1298 (2007). Abstention is also appropriate "where granting injunctive relief would be

17  unnecessarily burdensome for the trial court to monitor and enforce given the availability

18  of more effective means of redress." Id. And it is appropriate "when granting the

19  requested relief would require a trial court to assume the functions of an administrative

20  agency, or to interfere with the functions of an administrative agency." Id.; see also Klein

21  v. Chevron U.S.A., Inc., 202 Cal. App. 4th 1342, 1366 (2012) (courts apply abstention

22  doctrine where "plaintiffs had asserted claims that would necessarily require the trial court

23  to resolve complex policy issues," and there is "an alternative mechanism for resolving the

24  issues the plaintiffs had raised in their complaints.").

25  Alvarado is an example of a case in which the court applied the abstention doctrine.

26  At issue was whether certain skilled nursing and care facilities complied with statutory

27  nursing hour requirements. Alvarado, 153 Cal. App. 4th at 1295. The California Court of

28  Appeal determined that adjudicating the case "would require the trial court to assume

general regulatory powers over the health care industry through the guise of enforcing the UCL, a task for which courts are not well-equipped." Id. at 1303–04. The agency was better suited to determine whether a particular facility was governed by one statute or another, to calculate the nursing hours for each facility in the case, to classify employees into different categories, to calculate their hours worked, etc. Id. at 1305–06. The agency was also better able "to provide an alternative and more effective remedy." Id. at 1306.

In Shuts v. Covenant Holdco LLC, 208 Cal. App. 4th 609 (2012), the California Court of Appeal revisited the abstention doctrine in the context of skilled nursing facilities. The court distinguished Alvarado and declined to abstain, holding that "at least at this very early stage of the proceedings where the critical issues are largely undefined, '[a] judicial determination as to whether [a skilled nursing facility] satisfies its obligations under [the statute]'s staffing requirement does not appear to implicate technical or policy determinations usually reserved to an administrative agency.'" Shuts, 208 Cal. App. 4th at 621 (quoting Wehlage v. EmpRes Healthcare, Inc., 791 F. Supp. 2d 774, 787 (N.D. Cal. 2011)). The court stated that "a court should not abstain from deciding a case when the Legislature 'already has made the relevant policy determinations.'" Id. (quoting Arce v. Kaiser Found. Health Plan, Inc., 181 Cal. App. 4th 471, 501 (2010)). It concluded that the statute was "sufficiently specific for a court to competently determine whether such statutory guidance is being followed," adding that "since Alvarado was decided in 2007, the [agency] has made significant progress in providing administrative guidance on the . . . standard, and how it should be calculated." Id. at 621–22. It further noted that "this will not be the first time courts have been called upon to adjudicate whether skilled nursing facilities have violated applicable staffing standards." Id. at 623.

### b. Application Here

Here, MBC has "responsibility for . . . enforcement of the disciplinary and criminal provisions of the Medical Practice Act." Cal. Bus. & Prof. Code § 2004. But that does not mean that it must adjudicate this case, or even that it can.

As an initial matter, AAEMPG argues that MBC does not even have jurisdiction

over Envision, as it only has jurisdiction over licensed (or unlicensed) physicians. Opp'n at 4–5.[6] This is not exactly right. The statute defines "person" as including a "corporation, limited liability company, or other organization." See Cal. Bus. & Prof. C. § 2032. So the language in the statute prohibiting "Any person who practices or attempts to practice, or who holds himself or herself out as practicing . . . [medicine] without having at the time of doing so a valid, unrevoked, or unsuspended certificate," Cal. Bus. & Prof. C. § 2052, could apply to a corporation that practiced medicine. As could the prohibition on any person "conspiring with or aiding and abetting another in the unlicensed practice of medicine." See Cal. Bus. & Prof. C. § 2052(b).

But it is not clear that MBC has experience investigating and pursuing a case like this. At the motion hearing, the parties were at something of a loss when imagining what such an inquiry would look like, and even how it would be initiated. MBC's role is typically to "investigate, . . . commence disciplinary actions, and . . . take disciplinary action against a physician's license based on unprofessional conduct as defined in the Medical Practice Act." See Griffiths v. Superior Court, 96 Cal. App. 4th 757, 768–69 (2002). There is no indication that MBC would be able to get its arms around the FAC's detailed allegations about a multi-billion dollar corporation's business structure, contracts, and practices. As AAEMPG states, the "systemic and pervasive violation of the law" that it alleges in the FAC "will not be remedied by disciplining . . . individual physicians." Opp'n at 7.

A further impediment to applying the abstention doctrine is that although the case is broadly about the corporate practice of medicine, it also involves a number of additional issues. See, e.g., FAC ¶ 79 (alleging that Envision violates the "unlawful" prong of the UCL based on the CPOM ban and specifically Cal. Business & Professions Code §§ 650,

---

[6] It also argues that Business and Professions Code § 650, which it alleges that Envision violated, is not part of the Medical Practice Act. Id. at 5. Section 652 confers enforcement jurisdiction over violations of § 650 to "the board by whom he or she is licensed," and AAEMP's point is that Envision has no medical license. Id. at 5–6. It is not clear whether MBC would really not address Envision's alleged violation of section 650.

2400, 2052, 16600, and Cal. Corporations Code. §§ 13407 and 13408.5), ¶ 81 (alleging that Envision violates the "unfair" prong of the UCL because Envision's conduct caused AAEMPG to lose its contract with PLEP, Envision threatens an incipient violation of antitrust law, Envision increases medical costs to patients because of billing practices and thwarting competitors, Envision's false advertising is unlawful under 15 U.S.C. § 52(a), Envision violates the Cartwright Act, Envision substantially lessens competition with lawful medical groups, Envision reduces the market for lawful operating management services organizations, Envision significantly threatens and harms competition, Envision harms public policy), ¶ 82 (alleging that Envision violates the "fraudulent" prong of the UCL because it represents that Envision Physician Services is a physician group lawfully structured and able to provide medical services in violation of Business and Professions Code § 17500, because it calls itself a "physician-led medical group," and "one of the nation's largest medical groups," and "the nation's largest emergency medical group."). There is no reason to believe that MBC is equipped to address those issues. And so it is not clear that there is "an alternative mechanism for resolving the issues the plaintiffs . . . raised in their complaints." See Klein, 202 Cal. App. 4th at 1366.

The issue raised in the complaint that MBC indisputably does have expertise in is the unauthorized practice of medicine. But as to that issue, there is a fair amount of guidance available to the Court. See Shuts, 208 Cal. App. 4th at 621–22 (statute was "sufficiently specific for a court to competently determine whether such statutory guidance is being followed"; agency had "made significant progress in providing administrative guidance on the . . . standard, and how it should be calculated."). For example, MBC has listed "health care decisions [that] should be made by a physician licensed in the State of California and would constitute the unlicensed practice of medicine if performed by an unlicensed person," as well as "'business' or 'management' decisions and activities, resulting in control over the physician's practice or medicine, [that] should be made by a licensed California physician and not by an unlicensed person or entity." Physicians and Surgeons. The list of prohibited decisions and activities includes the hiring and firing of

14

physicians, and the making of decisions about billing procedures, both of which the FAC alleges that Envision does on behalf of its professional corporations. Id.; FAC ¶¶ 39, 40.

At this stage, the Court does not need MBC in order to determine that AAEMPG has adequately alleged CPOM. Cf. Cost Mgmt. Servs., Inc. v. Washington Natural Gas Co., 99 F.3d 937, 949 (9th Cir. 1996) ("Because this case arises in the context of a motion to dismiss under Rule 12(b)(6), we must accept as true CMS's allegation that WNG violated Tariff 87. For that reason, the 'threshold decision' which WNG would have us refer to the [agency] must necessarily be resolved in favor of CMS."). And there is no reason now to believe that MBC would be better positioned than this Court to assess some of the more complex allegations that bear on CPOM, such as whether Envision's contracts include restrictive covenants, and whether its corporate structure gives rise to alter ego liability. See, e.g., Brovont v. KS-1 Med. Servs., P.A., 622 S.W.3d 671, 678 (2020) (case addressing the legal ramifications of Envision company with similar business model). "[T]his [would] not be the first time courts have been called upon to adjudicate whether" an entity was engaged in the unauthorized practice of medicine. See Shuts, 208 Cal. App. 4th at 623; see, e.g., Conrad v. Medical Bd. of California, 48 Cal. App. 4th 1038, 1042–43 (1996) (discussing case law on CPOM, and its exceptions).

The Court therefore does not apply the abstention doctrine.

### 2. Primary Jurisdiction

Primary jurisdiction "is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decision-making responsibility should be performed by the relevant agency rather than the courts." Syntek Semiconductor Co. v. Microchip Tech. Inc., 307 F.3d 775, 780 (9th Cir. 2002). The primary jurisdiction doctrine "permits judicial deference to administrative expertise." Bradley v. CVS Pharmacy, Inc., 64 Cal. App. 5th 902, 912 (2021). However, the doctrine does not "'require[] that all claims within an agency's purview . . . be decided by the agency,'" and is not "intended to 'secure expert advice' for the courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit.'" Syntek, 307 F.3d at 780

(quoting <u>Brown v. MCI WorldCom Network Servs., Inc.</u>, 277 F.3d 1166, 1172 (9th Cir. 2002)). Instead, it is a "'doctrine used by the courts to allocate initial decisionmaking responsibility between agencies and courts where such [jurisdictional] overlaps and potential for conflicts exist.'" <u>Id.</u> (quoting Richard J. Pierce, Jr., <u>Administrative Law Treatise</u> § 14.1, p. 917 (4th ed. 2002)). "Unless an agency is empowered to decide all the issues in a pending lawsuit, the appropriate procedure for a court that applies the primary jurisdiction doctrine is to stay the lawsuit pending a decision by the administrative agency." <u>Bradley</u>, 64 Cal. App. 5th at 913; <u>but see</u> <u>Syntek,</u> 307 F.3d at 782 n.3 (court can stay case or dismiss without prejudice).

Courts traditionally consider four factors in weighing whether to apply the primary jurisdiction doctrine: "[a] the need to resolve an issue that [b] has been placed by Congress within the jurisdiction of an administrative body having regulatory authority [c] pursuant to a statute that subjects an industry or activity to a comprehensive regulatory authority that [d] requires expertise or uniformity in administration." <u>Syntek</u>, 307 F.3d at 781 (citing <u>U. S. v. General Dynamics</u>, 828 F.2d 1356, 1362 (9th Cir. 1987)).

### a. Issue

As to the first prong, AAEMPG notes that while primary jurisdiction is about initial decision-making, Envision never actually identifies "what initial decision the Board should be asked to make"—i.e., which issues the Court would refer. Opp'n at 4. One issue might be whether Envision's exercise of "profound and pervasive direct and indirect control and/or influence over the medical practice, making decisions which bear directly and indirectly on the practice of medicine, by rendering physicians as mere employees, and diminishing physician independence and freedom from commercial interests," FAC ¶ 38, constitutes the unauthorized practice of medicine. In other words, the parties could ask MBC: "do these various practices constitute CPOM?"

But as discussed above, MBC has (and other sources have) already provided some helpful guidance on that question. <u>See</u> Physicians and Surgeons. This case is therefore distinguishable from <u>Hood v. Wholesoy & Co, Modesto Wholesoy Co. LLC</u>, No. 12-cv-

5550-YGR, 2013 WL 3553979, at *5–6 (N.D. Cal. July 12, 2013), which involved the propriety of listing "organic evaporated cane juice" instead of sugar, and labeling soy yogurt "yogurt," but in which the court noted that "the FDA's position is not settled." In Hood, it made sense to refer the case to the FDA because "should the Court go forward with consideration of the Complaint, it would find itself in a position of either having no set standard to apply, or announcing a standard and thereby overstepping its proper role." Id. at *6. The same absence of guidance is absent here.

### b.    Agency Jurisdiction

As to the second prong, while both parties agree that MBC has oversight over the unauthorized practice of medicine, AAEMPG asserts that California's legislature never gave MBC exclusive jurisdiction over that subject. Opp'n at 3. Envision concedes this point. See Reply at 5. This it must do because, as mentioned above, plenty of courts have adjudicated cases involving the unauthorized practice of medicine, including specifically CPOM. See, e.g., People v. Cole, 38 Cal. 4th 964, 970–71 (2006) ("The ban on the corporate practice of medicine generally precludes for-profit corporations—other than licensed medical corporations—from providing medical care through either salaried employees or independent contractors.") (citing Conrad v. Medical Bd. of California, 48 Cal. App. 4th 1038, 1047–48 (1996)); Steinsmith v. Medical Bd., 85 Cal. App. 4th 458, 463 (2000) (licensed physician who worked at clinic owned by two unlicensed individuals was properly fined); People ex rel. State Bd. of Medical Examiners v. Pacific Health Corp., 12 Cal. 2d 156 (1938) ("The issue presented herein is not new, and has been considered in this state by recent cases which are controlling. It is an established doctrine that a corporation may not engage in the practice of such professions as law, medicine or dentistry."); see also Blue Cross of Cal., Inc. v. Superior Court, 180 Cal. App. 4th 1237 (2009) (in case where city attorney sued to enforce California health care plans, city was "not asking the court to assume or interfere with the functions of an administrative agency" but "asking the court to perform an ordinary judicial function, namely, to grant relief under the UCL and the FAL for business practices that are made unlawful by statute.").

Envision's response to AAEMPG's cited authority is to dismiss it as just a "handful of cases" largely relating to "limited issues relating to individual doctors." Reply at 6. While that is true of the <u>Steinsmith</u> case, it is not true of <u>Cole</u> or <u>People ex rel. State Board of Medical Examiners</u>. Moreover, the complexity of this case is not a point in Envision's favor. This case is complicated because Envision's reach is extensive. <u>See</u> Reply at 6 ("None of the cases involved, as here, a complaint purporting to challenge practices allegedly extending throughout the State of California, involving multiple facilities, multiple contracts, and multiple entities, as this case on its face does."). But this case is also complicated because of the numerous issues the FAC raises, not all of which involve CPOM. <u>See</u> FAC ¶¶ 79–82. Only CPOM was "placed . . . within the jurisdiction of an administrative body having regulatory authority," <u>see</u> <u>Syntek</u>, 307 F.3d at 781, and that jurisdiction has been shared with the courts.

Moreover, there is a real question as to what MBC has the authority to do even as to CPOM as presented in this case. "The [MBC] is the only licensing board that is authorized to investigate or commence disciplinary actions relating to physicians and surgeons who have been issued [a license]." Cal. Bus. & Prof. Code § 2220.5. But that is not this case. In <u>Arnett v. Dal Cielo</u>, 14 Cal. 4th 4, 7–8 (1996), the Supreme Court of California discussed MBC's investigative powers, which include the ability to petition for injunctive relief against licensees found guilty of unprofessional conduct. That is a bit closer to what this case entails. Still, if MBC concluded that Envision, a corporation and therefore non-license-holder, was violating CPOM, it is not clear that MBC could deliver the kind of relief that AAEMPG seeks here. <u>See</u> FAC at 29 (Prayer for Relief).

### c.   Pursuant to Statute

As to the third prong, there is no question that the California legislature entrusted MBC with "responsibility for . . . enforcement of the disciplinary and criminal provisions of the Medical Practice Act." Cal. Bus. & Prof. Code § 2004. California Business and Professions Code § 2400 prohibits corporations from practicing medicine. <u>See</u> Cal. Bus. & Prof. C. § 2400. It further states that "Any person who practices . . . [medicine] without

18

having [a license] . . . is guilty of a public offense." Cal. Bus. & Prof. C. § 2052.

#### d. Requiring Expertise/Uniformity

As to the fourth prong, while MBC has expertise in the unauthorized practice of medicine, these facts differ from cases where the Court would have to go out on a limb to define whether soy yogurt is yogurt, see Hood, 2013 WL 3553979, at *6, or, where a physician was accused of overprescribing, whether a pharmacy was obligated to continue to fill his prescriptions, see Bradley, 64 Cal. App. 5th at 917 ("Board has a unique ability to evaluate whether a decision not to fill prescriptions was justified by a pharmaceutical licensee's 'professional training and judgment.'"); see also Davel Commc'ns, Inc. v. Qwest, 460 F.3d 1075, 1088 (9th Cir. 2006) (applying primary jurisdiction so FCC could interpret its own ambiguous order). Here, given the guidance available to the Court already, and the previous case law on the unauthorized practice of medicine, MBC's expertise may be unnecessary.

Because this case does not implicate an issue that the California legislature has placed within the jurisdiction of an agency that requires agency expertise, the Court does not apply the doctrine of primary jurisdiction.

#### B. Failure to State a Claim

As an alternative basis for dismissal, Envision argues that the FAC fails to state a claim. The Court again disagrees.

#### 1. UCL

Whatever the evidence ultimately shows, the FAC alleges a wide variety of ways in which Envision violates the UCL. See FAC ¶¶ 75–89. For example, the FAC alleges that Envision violates the UCL by unlawfully engaging in, and aiding and abetting, the CPOM in violation of Business & Professions Code §§ 2400, 2502, unlawfully forming professional corporations to violate laws on fee splitting, kickbacks and other practices, including Business & Professions Code § 650 and California Corporations Code § 13408.5, unlawfully paying consideration for the retention of emergency department contracts, in violation of Penal Code § 650 and Welfare & Institutions Code § 14107.2,

and unlawfully restraining the practice of medicine by requiring doctors to enter into restrictive covenants that restrict their employment. Id. ¶ 79.

The FAC includes numerous allegations that support the theory that Envision violates the CPOM. See, e.g., ¶¶ 38–45 (detailing ways in which Envision exercises control over professional medical groups). Amicus California Medical Association asserts that "[a] significant portion of the allegations in this action fall within CPOM's proscription against activities and practices affecting a physician's professional judgment. Indeed, there are allegations in the [FAC] that, if proven, demonstrate <u>classic CPOM violations</u>." CMA Amicus at 6 (emphasis added). The Court agrees. Envision's response to this point is that the FAC cannot support its claim based on CPOM laws throughout the United States because "much of the United States has no such ban." Mot. at 9. But the cause of action is based on California law, which does ban CPOM. <u>See</u> FAC ¶ 79(a); <u>see also</u> Opp'n at 16 ("Plaintiff does not premise its UCL claim on the violation of other states' laws, nor does it seek that the Court award remedies to address Defendants' violations of other states' laws. . . ."). Envision also argues that AAEMPG has failed to state a claim for CPOM because "it fails to allege that the medical corporation is not owned by a licensed physician." Mot. at 3. That argument misconstrues AAEMPG's theory of the case. AAEMPG's theory is that, notwithstanding the makeup of those professional medical groups, they are really controlled by Envision. <u>See, e.g.</u>, FAC ¶ 38; <u>see also</u> Opp'n at 12 (referring to "captive medical groups"). Those allegations are sufficient to state a claim under the UCL. <u>See</u> <u>People v. Superior Court (Cardillo)</u>, 218 Cal. App. 4th 492, 498 (2013) (error to dismiss "practicing medicine without a license count" against non-physician owners of marijuana dispensaries/clinics who employed physicians, setting their hours, soliciting and scheduling patients, collecting fees from patients, and paying physicians a percentage of those fees).

The Court therefore denies the motion to dismiss the UCL claim.

### 2. Declaratory Relief

Envision argues in a single paragraph that the Court should decline to exercise

20

jurisdiction over the declaratory relief claim because it duplicates the UCL cause of action. Mot. at 15. AAEMPG does not address the issue of whether its declaratory relief claim is duplicative. Instead, it cites to authority holding that "[d]eclaratory relief is appropriate '(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" Opp'n at 24–25 (quoting Guerra v. Sutton, 783 F.2d 1371, 1376 (9th Cir. 1986)). And it asserts that a declaration is necessary because "Envision's systemic CPOM is highly repeatable" as Envision can repeat these same violations by creating new professional medical groups. Id. at 25.

Envision's alleged business model is certainly capable of repetition—according to the FAC, there are already "hundreds if not thousands of medical groups controlled by Envision Physician Services." FAC ¶ 32; see also id. ¶ 35 ("hundreds"). And while Envision is correct that the declaratory judgment claim appears duplicative of the UCL claim, see id. ¶¶ 92–100 (allegations supporting declaratory relief involve CPOM, kickbacks, restrictive covenants, unlawful agreements, etc.), the Court need not dismiss it at this time. In Brady v. Conseco, Inc., No. 08-5746 SI, 2009 WL 2356201, at *7 (N.D. Cal. 2009), Judge Illston explained that the defendants "have filed pleadings vigorously contesting plaintiffs' ability to demonstrate one or another of the essential elements of some of their claims," and that if the plaintiffs prevailed, "then declaratory relief might be plaintiffs' primary, or only, remedy." Judge Illston concluded that while she had discretion to dismiss a duplicative claim for declaratory relief, "[u]nder all of the circumstances. . . it would be premature to exercise such discretion at this early stage." Id. Similarly, there is no urgency here to dismiss the declaratory relief claim so early in the litigation. See also Digby Adler Grp., LLC v. Mercedes-Benz U.S.A., LLC, No. 14-cv-2349-THE, 2015 WL 1548872, at *9 (April 7, 2015) ("Defendant has not shown that any prejudice would result from allowing this claim to proceed. Accordingly, at this early stage, the Court finds that it is premature to foreclose the possibility of declaratory relief."). The Court therefore denies the motion to dismiss the declaratory relief claim at

this time.[7]

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES the motion to dismiss on both grounds.

**IT IS SO ORDERED.**

Dated: May 27, 2022



CHARLES R. BREYER
United States District Judge

---

[7] Envision also argues that the FAC fails as to Envision Healthcare Corporation because it alleges no facts as to that entity other than "the mere fact of ownership." Id. But the FAC alleges that Envision Healthcare Corp. is the alter ego of Envision Physician Services LLC, having common ownership and no separate corporate identities. See FAC ¶¶ 3, 23–26. The allegations against Envision Physician Services also apply to Envision Healthcare Corp.